EDNA C. OSBORN, administratrix, &c., respondent,

*v.*

HENRY DIFFANY, appellant.

[Decided February 6th, 1928.]

1. In an accounting between parties operating upon a profit-sharing agreement, where there is no agreement that one of the parties should also share in the loss, losses may not be charged off against his account.

2. Unless exceptions be taken to the master's finding on an accounting, the finding will be allowed to stand.

3. Upon an examination of the master's report and consideration of various exceptions taken to it, the report was held to be substantially correct.

---

On appeal from a decree of the court of chancery advised by Vice-Chancellor Fielder, who filed the following opinion:

"In the bill of complaint filed February 6th, 1924, S. Harvey Osborn, complainant, alleged that in the year 1916 he entered into a verbal co-partnership agreement with Henry Diffany, defendant, under which they were to share the profits and losses of a certain business equally, which agreement was still in force, and Osborn prayed for an accounting. Diffany answered denying that a partnership existed, and alleging that they entered into an agreement in 1916, which was still in effect, whereby Osborn was employed in the business by Diffany at a salary of $20 per week, and if the net profits of the business should exceed the sum of $20 per week Osborn was to receive one-half of such profits, less said salary, as a commission. Osborn died November 25th, 1924 [before final hearing], and his administratrix was substituted as complainant. Upon final hearing this court found that the agreement was as alleged in Diffany's answer, and it was referred to a special master to take a mutual account of all dealings and transactions between the parties under said agreement, and to ascertain and report what balance appeared to be due from either party to the other. The result of such accounting was that the master reported $7,770.64 due from Diffany to the complainant, and the matter is now before me on exceptions to the report, filed on behalf of Diffany.

"Before proceeding to consider the exceptions, it should be observed that Diffany managed the business in question; that its books of accounts and records were kept by him or under his supervision; that all deposits in the business bank accounts were made by him, and that he alone signed checks drawn on the bank accounts, and he paid all bills for material, labor and other business expenses, including the payments made to Osborn, and that he received all money due the business. Osborn appears to have been the salesman of the articles manufactured in the business. In the nine years the business relations continued Diffany settled no account of the business affairs with Osborn, although the latter frequently requested a settlement. Just prior to the commencement of this suit, and as a result of a demand made by Osborn, Diffany offered to pay Osborn $7,500 in settlement of the latter's claim under the agreement, which sum Osborn refused to accept. Diffany

now says that his offer was made at a time when he was unaware that the business had made no profit for the years 1923 and 1924, and that it also was made because he desired to avoid a lawsuit. He now claims that he owed Osborn nothing —in fact, that Osborn was overpaid. A fire in the factory building November 13th, 1923, destroyed some books of account and records, and Diffany testified that without the destroyed records he can present no financial statement of his dealings with Osborn. He testified at several hearings before the master, at the first of which he produced some books of account and memoranda, and as the hearings progressed it appeared that he had other records, books and private memoranda, none of which were produced voluntarily, but only after his examination by counsel disclosed that he had them and production was demanded. He had filed no income tax return for the years 1916 to 1922, inclusive, although it is apparent from the evidence that he had done a gross business annually of many thousands of dollars, and that he filed such return for the years 1923 and 1924 for the purpose of showing a loss. During the period covered by the accounting he had employed a bookkeeper, who resided in Connecticut, to keep his books, and when he was requested to produce this man as a witness before the master he declined to do so, although the man was still in his employ and he had produced him at the hearing before this court. The master reports that Diffany produced his sales book covering the accounting period and a ledger for the years 1922, 1923 and 1924; that Diffany sought to discredit the accuracy of the sales book but offered no aid in striking therefrom irrelevant or improper items; but after the ledger had been marked in evidence by the master Diffany mutilated it, such mutilation having been done, according to Diffany's counsel, for the purpose of removing therefrom accounts of business done since Osborn's death. I have requested Diffany's counsel to produce said ledger before me, but he has failed to do so. The master further reports that Diffany's attitude toward the accounting made it difficult for the master to take an account; that in his opinion Diffany did not act in compliance with the order of this court that he account and gave no assistance in mak-

ing up an account. After reading Diffany's testimony before the master, I agree with and concur in the master's criticism of Diffany. While Osborn was alive and was demanding an accounting, Diffany could have prepared one with little difficulty. Osborn, who had access to the sales book, had prepared an account and had submitted it to Diffany. This account was in possession of complainant's counsel at the hearing before the master and he offered to put it in evidence, but Diffany's counsel objected and refused to permit Diffany to comment on it. It seems to me that Osborn's account might have aided the master, and, if it was incorrect, that Diffany could have shown its inaccuracy without difficulty. Diffany's refusal or neglect to make up an account in Osborn's lifetime, and his attitude toward this accounting, do not commend him to me, now that Osborn's lips are sealed.

"Exceptions one, five and six may be considered together. January 1st, 1916, is taken as the date when the agreement between Osborn and Diffany went into effect. Prior to that date Diffany had engaged in the manufacture of bag frames, and he owned certain machinery which was used after January 1st, 1916, for the manufacture of shaving stands, which was the business in which Diffany and Osborn engaged. Diffany discontinued the manufacture of bag frames, but on January 1st, 1916, he had a stock of the manufactured articles on hand, which he proceeded to sell from time to time for his own account, and his sales of these frames amounted in 1917 to $1,174.23; in 1918 to $1,123.81 and in 1919 to $667.60. He had no record of bag sales for 1916 nor for any year after 1919. A fire occurred November 13th, 1923, which damaged machinery, manufactured goods and raw material. All were covered by insurance standing in Diffany's name. In the proofs of loss signed by Diffany he stated his claim on machinery loss to be $7,000 and $4,000 on his stock. His claims were settled for the full amount and $11,000 was paid to him, all of which he deposited in his private account and kept. Because the machinery was owned by Diffany, I think that the $7,000 he claimed and received for fire damage thereto belonged to him and that we have therefore no concern with the amount of depreciation to be charged against the ma-

chinery. Thereafter he proceeded to salvage the machinery, and, using his factory employes for that purpose, restored the machinery to such good condition that it was adequate and was used for the purpose of the business. In my judgment, the $7,000 insurance money Diffany received should have been used by him to salvage the machinery, but the expense of salvage was paid out of the receipts of the business and was charged to operating expenses. This was an improper charge as against Osborn, but there is no evidence to show how much was paid out on this account, and, therefore, it cannot be made a charge on this accounting against Diffany. The balance of $4,000 received by Diffany in settlement of the fire loss was claimed by him to cover stock in the factory. He further claims that the value of the stock manufactured and unmanufactured, belonging to the shaving stand business in which he and Osborn were interested, was at the time of the fire but $835, and that the balance, or $3,165, covered bag frames which he still had on hand. This claim strikes me as ridiculous. He had ceased manufacturing these frames January 1st, 1916, and from his stock on hand he had sold in three years $2,965.64 worth of frames. We have no record of his sales in 1916 or for any year after 1919. His evidence that, nearly eight years after he ceased manufacturing, he still had on hand bag frames to the value of $3,125, does not appeal to me as credible. If any bag frames were in the factory November 13th, 1923, it was because Diffany had found it impossible to sell them, and they were shopworn and of no value at the time of the fire. I conclude that the $4,000 fire loss paid on stock covered stock manufactured and unmanufactured, purchased with the proceeds of preceding sales of shaving stands, and, therefore, belonged to the shaving stand business. I disagree with the master that Diffany should be charged with $11,000, proceeds of insurance policies, and credited with $6,170, depreciation on machinery, and I find instead that Diffany should be charged with $4,000 proceeds of insurance covering stock.

"Exception two is that the master failed to allow Diffany credit for money he claimed to have loaned the business during the years 1918, 1919 and 1920, aggregating $2,704.01.

"Diffany's testimony, accompanied by the production of certain checks, comprises all there was before the master to prove these alleged loans. The checks produced before him totaled $2,741.01 [not $2,704.01], of which but $2,250 were drawn to the order of Diffany & Company, the others being to other payees. He claimed to have loaned $200 in 1918, $1,841.01 in 1919 and $700 in 1920. The check for the $200 loan in 1918 was to a payee other than Diffany & Company, and in that year Diffany & Osborn drew $2,495.94 from the earnings of the business. In 1919 they drew $7,090.24 from such earnings; in 1920 they drew $6,467.05, and in 1921, $5,171.07. January 1st, 1923, the business had a bank balance of $9,197.42; its bank balance December 31st, 1923, was $14,983.89, and December 31st, 1924, it was $6,589.93. If during the years 1918, 1919 and 1920 it was necessary for Diffany to loan money to the business [it would seem from the drawings that it was not necessary], the business had ample funds thereafter with which to repay such loans. As I have said, Diffany kept the books of account, deposited all money in bank and had sole and unrestricted power to draw against the bank account, and upon all the evidence I am not willing to believe he made these loans to the business, or, if he did, that he did not repay himself. He gave his testimony concerning these loans March 27th, 1925. I do not think he is the type of man who would permit a debt due him to become so stale, especially when he had control of funds out of which he could pay himself. This exception is disallowed.

"Exceptions three and four are that the master failed to allow Diffany credit for two items, one of $2,966.14, for sales of merchandise made by him, not within the agreement made between him and Osborn, and the other of $3,000 for rents belonging to Diffany, both of which items appear on the sales book of the business.

"These totals are made up from various items appearing on the sales book, being items which Diffany testified did not properly belong in the book, because they had no connection with the business in which he and Osborn were concerned. I find no testimony to show that these totals actually went into the business account and were treated as profits of the busi-

ness, or that Osborn received any portion thereof. Diffany was the person who received this money as it came in, and he kept the books and the bank accounts. He says these moneys belonged to him and not to the business. I cannot assume, in the absence of evidence, that he deposited his own money in the business bank account and not in his own account. The record on the books is merely a record that he received the money and is not a record of the disposition made of it. Perhaps the ledger, which he mutilated, would disclose the truth. The exceptions are disallowed.

"Exceptions seven and eight need not be here repeated, because I find no merit in them. I would observe that Diffany is not entitled to credit for any loss sustained by the business for the year 1924, because, under the terms of his agreement with Osborn, the latter was not a partner and was not to share losses; he was to share only in profits. The exceptions are disallowed.

"No exception was filed by complainant or defendant to the master's finding with respect to the drawings from the business by Osborn of $19,676.17 and by Diffany of $14,-624.89, or to the credit of $5,051.28 given by the master to Diffany because of Osborn's excess drawings. I would point out that under the agreement between Osborn and Diffany the former was entitled to draw $20 per week, and thereafter to share equally with Diffany in the profits. The amount charged against Osborn for his drawings include the $20 per week, and that weekly sum, it seems to me, should have been deducted from his drawings before determining whether or not his drawings were more or less than Diffany's. Further, Osborn's drawings probably include various items of money disbursed by him for expenses. However, no exception having been taken to the master's finding in this respect, the same will stand.

"I annex a schedule herewith in the form adopted by the master, to show the result of my findings on the exceptions. It will appear from this schedule that Diffany is indebted to the complainant in $7,359.64, to which interest from November 25th, 1924, should be added.

*102 N. J. Eq.*            Osborn *v.* Diffany.

ACCOUNT BETWEEN HENRY DIFFANY AND S. HARVEY OSBORN

*Dr.*

1924

Jan. 1,   Proceeds of insurance policies for damage to
stock .................................,.  $4,000.00
Cash in Broad and Market National Bank.....  3,983.89
Cash in Merchants and Manufacturers National
Bank .................................  8,318.45
Accounts receivable .......................  3,239.75
Merchandise inventory .....................  834.51

$20,376.60

*Cr.*

Accounts payable ..........................  774.37

$19,602.23

Osborn's drawings .............. $19,676.17
Diffany's drawings .............. 14,624.89

$5,051.28
Diffany is entitled to credit for..............  5,051.28

$14,559.95

Jany. 1,
1924,   Osborn is entitled to one-half of $14,550.95....  7,275.48
Nov. 25,
1924,   Osborn is entitled to one-half of value of mer-
chandise on hand ......................  696.48

$7,971.26

Nov. 25,
1924,   Deduct Osborn's excess drawings ............  612.32

Due from Diffany to Osborn ............°......  $7,359.64

*Messrs. King & Vogt,* for the respondent.

*Mr. Louis J. Beers,* for the appellant.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Fielder.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, VAN BUSKIRK, McGLENNON, KAYS, HETFIELD, DEAR, JJ.  15.

*For reversal*—None.